**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **JOHNNY BLASH,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**CITY OF HAWKINSVILLE AND PULASKI COUNTY, GEORGIA, SHERIFF'S OFFICE; HAWKINSVILLE-PULASKI COUNTY; BILLY W. CAPE; and DANNY BRANNEN,**<br><br>*Defendants.* | **CIVIL ACTION NO.**<br>**5:17-cv-00380-TES** |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case could easily boast of a thick, dense record, full of thorny and tangled racially-charged issues. But, when you dispassionately focus on the legal issues, the critical question the Court must answer really boils down to this: if a local sheriff suspects one of his deputies has acted improperly (or even criminally), must he provide that deputy with an independent criminal investigation in order to comply with the Constitution and Title VII?

The short answer is no.

## I.     INTRODUCTION

Without getting too detailed early on, Plaintiff, former-Deputy Sheriff Johnny Blash, allegedly compromised and interfered with the United States Postal Service's

("USPS") investigation into one of its employees suspected of stealing medication from postal customers. When Former Sheriff and now-deceased Defendant Billy W. Cape learned of the allegations regarding Blash, he fired him. Now, Blash contends that he was subjected to a hostile work environment while employed with the Pulaski County Sheriff's Office and that his race—not the supposed interference with the USPS investigation—was the true motivating factor behind Defendant Cape's refusal to investigate his alleged misconduct.

Elaborated in more detail in previous Orders, the Court, with Blash's consent, dismissed his hostile work environment and race-discrimination claims asserted against the Pulaski County Sheriff's Office and Pulaski County, Georgia. [Doc. 100 at p. 8]; [Doc. 37 at pp. 8–11]. Following a lengthy analysis, the Court also previously dismissed Blash's hostile work environment claims against Defendant Cape and Defendant Danny Brannen. [Doc. 37 at pp. 11–26]. Now, only three claims remain: a race-discrimination claim asserted under 42 U.S.C. § 1981 against Defendant Cape[1] in his individual capacity; and two race-discrimination claims against Defendant Brannen in his official

---

[1] During the pendency of this lawsuit, Defendant Cape died. Following his passing, the Court later substituted William Brian Cape as the legal representative for the estate of Defendant Billy Cape pursuant to Federal Rule of Civil Procedure 25. [Doc. 98]; [Doc. 99].

capacity, one asserted under Title VII of the Civil Rights of 1964 and the other asserted

under 42 U.S.C. § 1981.[2]

When confronted with a defendant's motion for summary judgment on claims

for race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §

1981, a plaintiff must make a sufficient factual showing to permit a reasonable jury to

rule in his favor. While this can be done in a variety of ways, perhaps the most

familiar—and most apt to this case—is the three-part burden shifting framework

established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973). The *McDonnell Douglas* framework places the initial burden on a plaintiff to

establish a prima facie case of race discrimination by proving that he was treated

differently from some other "similarly situated" individual or "comparator." *Lewis v.

City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) ("*Lewis I*") (citing *Texas Dep't of

Cmty. Affairs v. Burdine*, 450 U.S. 248, 258–59 (1981)).

In arguing that Blash cannot show a valid comparator, Defendants cite to the

recently-abrogated *Holifield v. Reno*, for the proposition that "[t]o make a comparison of

---

[2] As further explained below, Blash's Section 1981 claims may only be brought pursuant to Section 1983 given that the alleged violator acted under color of state law. Section 1983 exists to remedy the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" and "provides the exclusive federal damages remedy for the violation of the rights guaranteed by [Section] 1981 when the claim is pressed against a state actor." *Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991). Stated another way, state actors cannot be sued for constitutional violations outside the purview of Section 1983. *Butts v. County of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000). Therefore, the Court construes Blash's Section 1981 claims as claims asserted under Section 1983 and not as direct actions via Section 1981. Therefore, Blash's Section 1981 claims will be referred to as Section 1983 claims throughout this Order.

[a] plaintiff's treatment to that of non-minority employees, [that] plaintiff must show that he and the employees are similarly situated in all relevant respects." 115 F.3d 1555, 1562 (11th Cir. 1997) (*abrogated by Lewis I*, 918 F.3d 1213). However, over a month before Defendants Cape and Brannen filed their Motion for Summary Judgment [Doc. 64] applying the *Holifield* standard, the Eleventh Circuit Court of Appeals decided *Lewis I* "[i]n an effort to clean up, and to clarify once and for all" its self-described "mess" with regard to comparator analyses and answer "[t]he obvious question: Just how 'similarly situated' must a plaintiff and [his] comparator(s) be?" 918 F.3d at 1217–18. In *Lewis I*, the Eleventh Circuit Court of Appeals held that "the proper test for evaluating comparator evidence is neither plain-old 'same or similar' nor 'nearly identical,' as . . . past cases have discordantly suggested." *Id*. at 1218. Instead, "a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that [he] and [his] proffered comparators were 'similarly situated in all material respects.'" *Id.* That being said, the Court's comparator analysis relies on the new standard announced in *Lewis I.*

## II.     FACTUAL BACKGROUND

Taking all reasonable inferences in Blash's favor, the facts of this case are as follows.

Prior to working for Pulaski County, Georgia, Blash worked for the City of Hawkinsville as a police officer. [Doc. 78, Blash Depo., pp. 31:23—32:1]. In 2010, the City of Hawkinsville and Pulaski County reached an agreement for the Pulaski County

Sheriff's Office to hire city police officers. [*Id.* at p. 32:2–6]. Within his first year of employment, Blash received positive feedback on his work performance and a recommendation for a raise. [Doc. 70-8 at pp. 2–3]. On a scale including scores of "Excellent," "Good," "Fair," and "Poor," Blash received a score of "Good" for all categories including, among others, honesty, work quality, cooperation, working relations, and communication skills. [*Id.* at p. 2]. However, despite this seemingly promising review, Defendant Cape fired Blash on December 1, 2014.[3] [Doc. 64-2 at ¶ 28].

According to Blash, sometime in late spring or early summer 2014, while on routine patrol, he spoke to Scott Orta, "a local handyman who[,] from time to time[,] worked on [his] house." [Doc. 70-2 at ¶¶ 60–61]. During this conversation, Orta mentioned to Blash "that a postal driver named Renee [Howard] had been approaching him about his pain medication." [*Id.* at ¶ 61]; [Doc. 70-15 at ¶¶ 4–5]. Around that time, Renee Howard was under surveillance (ostensibly from the USPS) because she was suspected of stealing medication from postal customers while carrying out her postal route. [Doc. 70-2 at ¶¶ 48, 51]; [Doc. 64-3, Williams Aff., ¶ 4]. Then around late October

---

[3] This is the only review of Blash's employment history in the record. There are no other reviews filed in the record for subsequent years until his termination.

or November 2014, Chief Investigator Robert McGriff showed Blash a photograph of a man who Blash identified as Scott Orta.[4] [Doc. 70-2 at ¶¶ 47, 53–54]; [Doc. 70-15 at ¶ 5].

On November 23, 2014, supposedly after the conclusion of the USPS investigation and Renee Howard's arrest,[5] Blash saw Orta while he (Blash) was "on normal patrol duties" and "motioned for Orta to come speak to him." [Doc. 70-2 at ¶ 62 (citing [Doc. 70-15, Blash Dec., ¶¶ 6–7])]; [Doc. 11-1 at p. 3]; [Doc. 36. It was then that Blash "cautioned [Orta] to 'stay away from Renee.'" [Doc. 70-2 at ¶ 62]. By Blash's account, at the time he warned Orta about Renee Howard, he "was not advised or aware that there was any ongoing investigation regarding [her]." [*Id.* at ¶¶ 65–66]; *see also* [Doc. 70-15, Blash Dec., ¶ 7]. In fact, Robert McGriff apparently told Blash, "several weeks before" that "the sting operation was over" because "they 'got' Renee." [Doc. 70-2 at ¶ 65]; [Doc. 70-15, Blash Dec., ¶ 7]. Based on this, Blash contends that he had no

---

[4] The parties disagree about the context in which this occurred. By Defendants' account, Blash walked into the Sheriff's Office during a "pre-operation briefing" for the post office investigation and saw "images of subjects of the investigation" on display. *Compare* [Doc. 64-2 at ¶ 11] *with* [Doc. 70-1 at ¶ 11]. Upon seeing these images, Blash apparently indicated that he was familiar with one of the photographed individuals, Scott Orta. [Doc. 64-2 at ¶ 12].

Blash, however, claims that he "was sitting in the station doing paperwork when Chief Investigator McGriff and individuals [he] recognized as postal investigators entered the station." [Doc. 70-15 at ¶ 5]; *see also* [Doc. 70-1 at ¶ 11]. It was then, according to Blash, that Robert McGriff showed him a photograph and asked Blash if he could identify the individual. [Doc. 70-1 at ¶ 11].

Despite the minimal materiality of this disagreement, the Declaration of Robert McGriff confirms that McGriff did, in fact, show Blash a photograph of Scott Orta to see whether Blash "knew who th[e] individual was." [Doc. 70-16 at ¶ 14].

[5] While an arrest record indicating Renee Howard's date of arrest would have been extremely helpful in determining whether Blash "interfered" with the USPS investigation, no such record is before the Court for consideration.

reason to believe that any word of caution to Scott Orta would impact any investigation. [Doc. 70-2 at ¶ 66]; [Doc. 70-15, Blash Dec., ¶ 7]. However, Blash never explained why he would tell Orta to stay away from Renee Howard if she had in fact already been arrested and the criminal investigation had already been concluded.

On December 1, 2014, "[w]hen [Defendant] Cape told Blash that he was being fired, Blash asked that any termination decision be held in abeyance pending an investigation by the Georgia Bureau of Investigation ('GBI')." [Doc. 70-1 at ¶ 28]; *see also* [Doc. 70-2 at ¶ 68]. Presumably, Blash requested a GBI investigation to show that the USPS investigation was not active when he warned Orta about Renee. *See* n.5, *supra*. These independent investigations are "conducted by a law enforcement agency [that is] not connected to the Pulsaki County Sheriff's Office . . . to ensure fairness." [Doc. 78, Blash Depo., pp. 41:17—42:2]. For example, when two Caucasian deputies, Chris White and Jordan Peavy, were accused of using excessive force against an arrestee, they received a GBI investigation to verify their misconduct before any termination decision was made. [Doc. 70-2 at ¶¶ 70–71]. "[U]ltimately," this GBI investigation "cleared them of the allegations." [Doc. 78, Blash Depo., p. 41:12–16].

Based on these facts, Blash alleges that Defendant Cape denied him a GBI investigation because of his race and color. [Doc. 58 at ¶ 6]. The pre-discovery theory of Blash's case was that his supervisor (and deputy sheriff), Defendant Brannen, created a hostile work environment towards African Americans which Defendant Cape, as the

former sheriff, allowed and tolerated. [*Id.* at ¶ 15, 17–19]. The Court previously dismissed Blash's hostile work environment claims brought via 42 U.S.C. § 1981, because he was unable to allege that Defendant Brannen's comments or behavior were so severe or pervasive that they altered the terms and conditions of his employment and created a discriminatorily abusive working environment. [Doc. 37 at pp. 14–21]. Now, in his Response to Defendants' summary judgment motion, Blash attempts to fix this pleading inadequacy by bringing evidence of more racially-charged incidents involving Defendant Brannen that he uncovered during discovery. *See* [Doc. 70 at pp. 2– 5]; *see also* [Doc. 70-2 at ¶¶ 14–28, 32–34].

As more fully explained in the Court's Order Denying Plaintiff's Motion for Reconsideration, these new allegations should have been included in a Second Amended Complaint in order for the Court to consider them. *See generally* [Doc. 100]. However, Blash did not attempt to file such a complaint, and the parties appear to—at the summary judgment stage—affix a new theory to this case. Blash now contends that the lack of a formal investigation before his termination indicates that he was fired for a pretextual reason, concocted by Defendants to cover up Defendant Cape's racial animus behind the decision. *See* [Doc. 70-1 at ¶ 31]. Essentially, Blash maintains that his termination was "based upon . . . bogus allegations" with respect to his involvement with the USPS investigation, because the investigation "had already . . . concluded" at

the time he told Orta to stay away from Renee. [Doc. 58 at ¶¶ 23, 38]; [Doc. 70-2 at ¶ 64].[6]

In addition to Blash's claim that his termination was for "bogus" reasons, he asserts that it was common practice for officers to warn citizens "with whom they were familiar" about associating with suspected persons. [Doc. 70-2 at ¶¶ 62–63]; [Doc. 58 at ¶ 24]. At any rate, Blash's entire case is premised on the contention that he was discriminatorily denied a GBI investigation that could have shown that the reason given for his termination was "bogus," and that he, in fact, "did not do anything wrong." [Doc. 58 at ¶¶ 35–38]; [Doc. 70-16, McGriff Dec., ¶ 20].

### III.    EVIDENTIARY OBJECTIONS

Before turning to the summary judgment motion, the Court must resolve Blash's numerous hearsay-based objections to Defendant Brannen's deposition, his interrogatory responses, and the Affidavit of Jay Williams [Doc. 64-3]. [Doc. 79]. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999)). However, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the

---

[6] The Court notes a Pulaski County Grand Jury returned an Indictment charging Blash with Violation of Oath by Public Officer and Obstruction of an Officer. [Doc. 11-1 at p. 3]. However, the Superior Court of Pulaski County *nolle prossed* these charges on September 18, 2017. [*Id.* at p. 4]; [Doc. 36].

statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1293–94 (quoting *Macuba*, 193 F.3d at 1323); *see also* Fed. R. Evid. 801.

But, as noted earlier in the record, Defendant Cape died during the pendency of this litigation, and neither side obtained any testimony from him. [Doc. 88]; [Doc. 98]; [Doc. 99]. Therefore, to the extent any testimony is predicted on words allegedly spoken by Defendant Cape, the Court **SUSTAINS** Blash's hearsay objections so that the Court will not consider any such statements.

However, the Court **OVERRULES** any objection related to the Affidavit of Jay Williams. [Doc. 64-3]. Jay Williams worked as a deputy sheriff in Pulaski County at all relevant times for this case, and for a portion of that employment he received an assignment to work with the Oconee Drug Task Force. Jay Williams' affidavit provides an account of the events surrounding this case and his assistance to the USPS in connection with its investigation of Renee Howard.

Blash argues that Federal Rule of Evidence 602 "provides in pertinent part that '[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." [Doc. 79 at p. 2 (citing Fed. R. Evid. 602)]. Regarding Jay Williams' affidavit, Blash objects to the following statements on the basis that they are largely based on inadmissible hearsay:

> Paragraph 10: "After the pre-operation briefing, Agent Arrington contacted [Jay Williams] and stated that the postal investigation may be compromised[,] because its existence had been leaked to Scott Orta."

Paragraph 11: "Agent Arrington advised [Jay Williams] that the female postal worker reported receiving a call from Scott Orta. By this time, the female postal worker had agreed to be a cooperating witness."

Paragraph 12: "Agent Arrington further advised [Jay Williams] that according to the female postal worker, Orta communicated to her that an unnamed Pulaski County [d]eputy advised Orta to stay away from the female postal worker."

Paragraph 13: "Agent Arrington indicated that the female postal worker was worried about her safety[,] because she had been assured that her role as a cooperating witness would remain secret."

Paragraph 15: "After learning of the leak, Agent Arrington and [Jay Williams] interviewed Scott Orta. During that interview, Orta communicated that Deputy Blash saw him at a grocery store and directed Orta to follow him to a baseball field in town."

Paragraph 16: "During his interview, Orta relayed that when he arrived at the baseball field, Blash told him that he needed to pay attention to what was going on around him."

Paragraph 17: "Orta further revealed during the interview that when he asked Blash what he meant, Blash responded by stating 'Renee,' which was the first name of the female postal worker."

Paragraph 18: "Orta confirmed during the interview that he called the female postal worker after his conversation with Blash."

Paragraph 19: "Upon learning about Blash's conduct, Agent Arrington told [Jay Williams] that either [Jay Williams] would advise [his] superiors of Blash's conduct or Arrington would 'handle it.' In response, [Jay Williams] advised Agent Arrington that [Jay Williams] preferred to bring Blash's conduct to the attention of [Jay Williams'] supervisor at the Pulaski County Sheriff's Office, Major Freemont."

Paragraph 20: "Shortly thereafter, [Jay Williams] briefed Major Freemont that Blash had compromised the postal investigation. In particular, [Jay Williams] communicated that Blash had revealed the existence of the

investigation to a suspect who, in turn, advised the female postal worker that a Pulaski County [d]eputy warned the suspect to stay away from her."

Paragraph 21: "[Jay Williams] also communicated to Major Freemont that the female postal worker communicated to Agent Arrington that the conversation with the suspect made her nervous about being a cooperating witness."

Paragraph 22: "While briefing Major Freemont, [Jay Williams] expressed [his] opinion that Blash potentially compromised the safety of the female postal worker as the suspect could have flipped and harmed her."

Paragraph 23: "[Jay Williams] also communicated to Major Freemont that Agent Arrington advised [Jay Williams] that the USPS would 'handle' Blash if the Pulaski County Sheriff's Office did not take internal action."

[Doc. 64-3 at ¶¶ 10–13, 15–18, 20–23]; [Doc. 79 at pp. 14–16]. However, none of these statements are made by declarants who are, to the Court's knowledge, unavailable; and if necessary, Jay Williams could testify as to what he said, as could both Scott Orta, Agent Jarrett Arrington, and Major Jason[7] Freemont.

In the end though, none of these hearsay-based arguments even matter. It doesn't matter what was said in each of these comments, because yes, they may very well constitute hearsay if they cannot be reduced to admissible form. *See* Fed. R. Civ. P. 56(c)(2). Who said what to whom, and how whatever was said ultimately landed on Defendant Cape's ears is irrelevant. Certainly, a factual statement that someone spoke to another person is not hearsay. Hearsay goes one step further and looks to the contents of what was said *in that statement*. So, the Court can undoubtedly conclude that

---

[7] [Doc. 72-1, Brannen Depo., p. 29:2 (providing Major Freemont's first name)].

somehow, something—through a conduit of what seems to be three different people—made its way to Defendant Cape. What it is, we don't know and it's irrelevant, because Defendant Cape made the decision to terminate Blash. Even omitting this convoluted, and ultimately useless evidence, this chain of communication provides no help in resolving the race-discrimination issue before the Court. At the end of the day, Blash must prove that Defendant Cape fired him because he is black.

Blash seems to be of the impression that "Defendants[ ] fail[ed] to preserve [Defendant] Cape's testimony while he was still alive." [Doc. 79 at p. 11]. Regardless of which side needed Defendant Cape's testimony—no one obtained any testimony from Defendant Cape. If neither side thought it important, they're clearly mistaken. While death is—sometimes—the most unpredictable and unexpected thing a person can encounter, there are procedural mechanisms[8] in place to preserve such critical testimony. However, no one utilized them in this case.

## IV.  DISCUSSION

### A.  Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[8] Federal Rule of Civil Procedure 27 permits "[a] person who wants to perpetuate testimony about any matter cognizable in a United States court [to] file a verified petition in the district court for the district where any expected adverse party resides." Fed. R. Civ. P. 27(a). This procedural rule permits the taking of a deposition before an action is commenced. Even through Defendant Cape was still alive when Blash filed this lawsuit, if either party feared losing his all-important testimony, either party could have moved the Court to perpetuate Defendant Cape's testimony even before the commencement of discovery.

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[9]

"When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437–38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

---

[9] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Fooods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## B. <u>Defendants' Motion for Summary Judgment</u>

Defendants present four main reasons why the Court should grant their Motion for Summary Judgment. First, they state that Blash's entire lawsuit is based on false premises. [Doc. 64-1 at p. 3]. Second, as to Blash's Title VII claim against Defendant

Brannen in his official capacity, they contend that it is procedurally deficient, because he filed his Charge of Discrimination against the county, not the sheriff's office. [*Id.* at p. 5]. Third, they argue that Blash's Title VII and Section 1983 claims are deficient as a matter of law. [*Id.* at pp. 9–16]. And finally, they claim that Defendant Cape in his individual capacity, as the former Sheriff of Pulaski County, is entitled to qualified immunity with respect to Blash's Section 1983 claim. [*Id.* at p. 16].

1. Defendants' Allegation That Blash's Amended Complaint Is Based on False Premises

According to Defendants, a simple, fact-based review of the record makes clear that the internal investigation disagreement upon which Blash makes his race discrimination claims is a false premise. [Doc. 64-1 at p. 3]. Within this first main argument, Defendants contend that Blash's claim that he "was a victim of 'baseless charges,'" is undermined by his concession that he did advise Scott Orta to stay away from the female postal worker. [*Id.* (quoting [Doc. 58 at ¶ 21])]; [Doc. 78, Blash Depo., p. 38:5–17]. But, as mentioned above, irrespective of the conceded fact that Blash actually spoke to Orta, what truly matters is whether Blash has been the victim of intentional race-based discrimination.

In a second sub-argument, Defendants also argue that Blash's "invocation of an 'independent investigation' is without merit," because the USPS (as an entity independent from the Pulaski County Sheriff's Office) investigated Blash's conduct. [Doc. 64-1 at pp. 3–5]; [Doc. 58 at ¶ 21]. Defendants state, "[i]t is not apparent—and

[Blash] will not be able to explain why—an 'independent investigation' would have caused [Defendant] Cape to reach a different conclusion when the facts were not in dispute." [Doc. 64-1 at p. 4]. To the contrary, the facts about certain aspects of the investigation (particularly when it ended) were obviously very much in dispute, and Blash clearly believes that an internal, independent investigation would have shown that his termination was unwarranted. [Doc. 58 at ¶¶ 35–38].

Finally, Defendants maintain that, in actuality, the USPS and the Oconee Drug Task Force jointly conducted the investigation into the female postal employee, not the Pulaski County Sherriff's Office. [Doc. 64-1 at pp. 4–5]. Instead, Defendants clarify that the Pulaski County Sherriff's Office merely oversaw the investigation regarding Renee Howard. Based on these three points, Defendants' general averment in favor of summary judgment is that because Blash's conduct "*was* investigated by law enforcement agencies independent of the Pulaski County Sheriff's Office," his claim that he did not receive any independent investigation is false. [*Id.* at p. 5 (emphasis added)]. However, as mentioned numerous times throughout this Order, this case hinges on something much more important than the results of any independent investigation—it simply comes down to whether Defendant Cape's decision to refuse Blash an independent investigation and ultimately terminate him was predicated upon unlawful discrimination.

2.      <u>Defendants' Allegation That Blash's Charge of Discrimination is Procedurally Deficient</u>

Before embarking on the comparator analysis under *Lewis I*, Defendants also claim that Blash's Title VII claim against Defendant Brannen in his official capacity is procedurally deficient, because Blash filed his Charge of Discrimination against the county instead of the sheriff's office. [Doc. 64-1 at pp. 5–9]. Applying the old adage, "you can't have your cake and eat it too," any argument that Blash should have served his Charge of Discrimination on the Pulaski County Sheriff's Office instead of Pulaski County itself creates an obvious disconnect regarding Defendants' previous arguments for dismissal of the Pulaski County Sheriff's Office.

Generally speaking, the Equal Employment Opportunity Commission ("EEOC") is charged with investigating "allegations of civil discrimination and harassment in the employment context and determining whether there is any reason to believe the allegations are true." *Virgo v. Riviera Beach Assocs.*, 30 F.3d 1350, 1358 (11th Cir. 1994). A person wanting to file a lawsuit under Title VII must first file a Charge of Discrimination with the EEOC "alleging a Title VII violation and exhaust all remedies provided by the EEOC." *Id.* (citing 42 U.S.C. § 2000e-5). "If the conciliation efforts are unsuccessful, the EEOC will inform the parties and issue a letter authorizing the complainant to file a Title VII suit." *Id.* And, as Defendants contend, a party not named in the Charge of Discrimination cannot ordinarily be sued in a subsequent civil action. *Id.*; [Doc. 64-1 at p. 6]. Under this general rule, a plaintiff's failure to name his correct

employer could be fatal to his lawsuit. However, a party unnamed in the Charge of Discrimination may be subjected to the jurisdiction of federal courts under certain conditions:

> (1) the similarity of interest between the named party and the unnamed party; (2) whether [a] plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties received adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

*Virgo*, 30 F.3d at 1358–59 (citations omitted).

Mainly, Defendants argue that because the Pulaski County Sheriff's Office is not named in Blash's Charge of Discrimination, it cannot subsequently be sued. [Doc. 64-1 at p. 6]. To support this contention, they correctly point to the Eleventh Circuit Court of Appeals' recognition that "the sheriff's office is not a division or subunit of . . . its county governing body." [*Id.* (quoting *Manders v. Lee*, 338 F.3d 1304, 1310 (11th Cir. 2003))]. Instead, "the sheriff's office is a separate constitutional office independent from [Pulaski] County and its governing body." *Manders*, 338 F.3d at 1310. However, as discussed by the Pulaski County Sheriff's Office in its unopposed dismissal motion, a sheriff's office is not a legal entity capable of being sued. [Doc. 12 at p. 4 (citing *Ga. Insurers Insolvency Pool v. Elbert Cty.*, 368 S.E.2d 500, 502 (Ga. 1988))]; *see also* [Doc. 28]. Accordingly, filing a Charge of Discrimination against the Pulaski County Sheriff's Office would lead only to the inevitable dismissal of any claim asserted against it. If the

"Pulaski County Commission," is not, as Defendants argue, the appropriate party against whom to file a Charge of Discrimination and a sheriff's office, because of its constitutional makeup, is not an entity capable of being sued, this leaves only one option—naming the individual (in his official capacity) elected as sheriff. Thus, the correct analysis to determine whether Blash's Title VII claim is procedurally deficient because he named the "Pulaski County Commission" in his Charge of Discrimination would include a review of the above factors with attention to the *person* holding the office (Defendant Cape) at the time of Blash's termination, not the Pulaski County Sheriff's Office.

The purpose of the naming requirement is to provide a defendant with notice of the charges against him and to inform the EEOC of all parties involved so that it may undertake an investigation for conciliation purposes. *Frazier v. Smith*, 12 F. Supp. 2d 1362, 1369 (S.D. Ga. 1998) (citing *Clark v. City of Macon*, 860 F. Supp. 1545, 1550–51 (M.D. Ga. 1994)). "Only where the purposes of Title VII have been fulfilled may such an action be brought against an individual who was not named in the EEOC [C]harge." *Frazier*, 12 F. Supp. 2d. at 1369 (citations omitted). In this instance, the burden falls on a plaintiff to "explain why the individual was not named and to demonstrate that the purposes of Title VII have been satisfied" despite the omission. *Id.*

Naturally, Blash begins by invoking the Eleventh Circuit Court of Appeals' instruction to liberally construe the EEOC's naming requirement. [Doc. 70 at p. 9]. He

argues that the purpose of a less-than-rigid, liberal construction "is to avoid creating a burdensome technical requirement . . . where employees file [their] initial EEOC [Charge] *pro se*," as Blash did here. [*Id.* (citing *Lewis v. Asplundh Tree Expert Co.*, No. 1:04-cv-00054-MP-AK, 2008 WL 650433, at *3 (N.D. Fla. Mar. 7, 2008), *aff'd in part, rev'd in part, and remanded*, 305 F. App'x 623 (11th Cir. 2008))]. Thus, the question becomes: were the purposes of Title VII fulfilled despite Blash's failure to name the acting sheriff in his EEOC Charge. *See Frazier*, 12 F. Supp. 2d. at 1369, *supra.* The short answer is yes.

Here, while Blash's Charge does not once mention the words "sheriff," "sheriff's office," or "Sheriff Cape," it does state that he was employed as an "[o]fficer." [Doc. 64-5 at p. 2]. Clearly, the EEOC investigator was able to conduct an interview with Blash, as the "Charging Party," and in turn receive a response from some "Respondent" denying Blash's allegations with detailed reasons—the same reasons Defendants have put to this Court to defend the claims against them. [Doc. 64-6]; [Doc. 64-7]; [Doc. 64-8]; [Doc. 64-9]. However, unlike the EEOC Charge, M.A. Butch Hall's (the Sole Commissioner of Pulaski County) letter in response to the EEOC's request for "[his] organization . . . to submit information and records," did name most, if not all, of the individuals involved in this lawsuit. [Doc. 64-8 at p. 2]. That said, "[s]urely the [Pulaski] County Sheriff would have received notice of such a claim." *Frazier*, 12 F. Supp. 2d. at 1369. How else would Commissioner Hall have conveyed such detail in his response without discussing the matter with his fellow elected official? Moreover, Blash named "Captain"

Danny Brannen in describing the particular events in his EEOC Charge. [Doc. 64-5 at p. 2]. Notwithstanding Blash's failure to list Defendant Cape as his employer in the Charge, an EEOC investigator successfully undertook an investigation, received relevant information for conciliation purposes, and provided a summary of her findings. Thus, looking at all of the subsequent documents related to Blash's Charge, it is clear that Defendant Cape received adequate notice of Blash's charges and undoubtedly knew what was going on. *See, e.g.*, [Doc. 64-8 at p. 2].

While the contents of Blash's EEOC Charge are not ideal, they ultimately fulfilled the purposes of Title VII and that is all that is required. Accordingly, the Court finds no reason to dismiss the Title VII claim now lodged against Defendant Brannen in his official capacity (as the current Sheriff of Pulaski County) just because Defendant Cape was not named in the EEOC Charge.

3.      <u>Defendants' Argument that Blash's Race-Discrimination Claims Are Deficient as a Matter of Law</u>

To put it in a few words as possible: the real issue in this case is not whether Defendant Brannen is a racist or wielded extraordinary influence over Defendant Cape's hiring and firing decisions, as Blash has argued again and again, but whether Defendant Cape acted with discriminatory intent when he fired Blash. [Doc. 64-2 at ¶ 28].

Blash's case arises principally out of Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer "to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Lewis I*, 918 F.3d at 1220 (quoting 42 U.S.C. § 2000e-2(a)(1)); [Doc. 58 at p. 12]. "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate . . . discriminatory practices and devices" used to disadvantage racial, gender, and religious minorities in the employment context. *Lewis I*, 918 F.3d at 1220 (quoting *McDonnell Douglas*, 411 U.S. at 800).

As already noted, Blash also asserted claims under 42 U.S.C. § 1983. [Doc. 58 at p. 13]. "The same analysis—and in particular, the *McDonnell Douglas* burden-shifting framework—applies to those claims, as well." *Lewis I*, 918 F.3d at 1220, n.5 (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Standard alleges that he was terminated on the basis of his race and national origin (Caucasian-American), in violation of Title VII and 42 U.S.C. § 1981. Both of these statutes have the same requirements of proof and use the same analytical framework[;] therefore[,] we shall explicitly address the Title VII claim with the understanding that the analysis applies to the [Section] 1981 claim as well.")).

        i.      The Comparator Analysis Under *McDonnell Douglas*

When a plaintiff alleges intentional discrimination and his case faces a defendant's motion for summary judgment, he "must present sufficient facts to permit a

jury to rule in [his] favor[,]" to ensure his case's survival. *Lewis I*, 918 F.3d at 1220. One way of ensuring that survival is, as previously mentioned, to satisfy the three-part burden-shifting framework set out in *McDonnell Douglas*, 411 U.S. 792. *Id.* Another is to "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants the inference of discrimination." *Id.* at n.6 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2001)).

As for the *McDonnell Douglas* route, a plaintiff bears the initial burden of establishing a prima facie case of intentional discrimination. *Lewis I*, 918 F.3d at 1220. This burden can be met "by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Id.* at 1220–21 (citation omitted). If a plaintiff succeeds in making a prima facie case, "the burden [then] shifts to [a] defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Then, if a defendant makes such an articulation, the burden shifts back to a plaintiff who must demonstrate that the proffered, nondiscriminatory reason was "merely a pretext for unlawful discrimination, an obligation that 'merges with [a] [plaintiff's] ultimate burden of persuading the [factfinder] that [he] has been the victim of intentional

discrimination.'" *Lewis I*, 918 F.3d at 1221 (quoting *Burdine*, 450 U.S. at 256) (second and third alterations in original).

"[D]iscrimination," first and foremost, "consists of *treating like cases differently*[,]" and if this true, the converse must also be true: "Treating *different* cases differently is not discriminatory, let alone intentionally so." *Lewis I*, 918 F.3d at 1222–23 (emphasis supplied) (first citing *N.L.R.B. v. Collier*, 553 F.2d 425, 428 (5th Cir. 1977) and then citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 11th Cir. 1984)). Thus, the first burden of *McDonnell Douglas* essentially calls upon a plaintiff to show that he "was treated *differently* from another 'similarly situated' individual"—or, a comparator. *Lewis I*, 918 F.3d at 1217 (citing *Burdine*, 450 U.S. at 258–59 (emphasis added)).

Unchanged by the Eleventh Circuit Court of Appeals' opinion in *Lewis I* is the placement of the comparator analysis, which still "must be conducted at the prima facie stage of *McDonnel Douglas*'s burden-shifting framework." 918 F.3d at 1218–24. However, the *Lewis I* court answered and changed course to "[t]he obvious question: Just how 'similarly situated' must a plaintiff and [his] comparator(s) be?" *Id.* at 1217. In cases like this one, "a plaintiff must show that [he] and [his] comparators are 'similarly situated in all material respects." *Id.* at 1224. Having established the correct standard to govern the "similarly situated" issue, the Court must now apply it to Blash's case.

In short, the Court concludes that Blash has not made a prima facie case because, under the Eleventh Circuit Court of Appeals' guidance in *Lewis I,* he and his proffered

comparators—Deputies Christ White and Jordan Peavy—are simply not "similarly situated in all material respects." *Id.* at 1229.

Easy points first: the first three prongs of the prima facie case are undoubtedly satisfied. Blash belongs to a protected class; his termination "subjected [him] to an adverse employment action;" and, based on his employment assessment and corresponding recommendation for an "increase in pay," he was "qualified to perform the job in question." *Id.* at 1220–21; *see also* [Doc. 72-1, Brannen Depo., p. 27:20–24]; [Doc. 70-2 at ¶ 9]; [Doc. 70-1 at ¶ 28]; [Doc. 70-8 at pp. 2–3]. Accordingly, all that is left for the Court to determine is whether Blash can show that he and his proffered comparators were "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1229.

In its most general sense, Blash's case boils down to this: Was Blash's race a motivating factor in his termination? Blash, obviously, says yes, because Defendant Cape gave an investigation to two white deputies, but not to him "even though [he] specifically requested [one]." [Doc. 70-15, Blash Dec., ¶ 12]. These two white deputies were "accused of assaulting an African American" during an arrest, and as a result of this accusation, the incident "was . . . investigated by the [GBI]," and they were "ultimately cleared . . . of the [accusations]." [Doc. 72-1, Brannen Depo., pp. 35:14—37:8]; [Doc. 78, Blash Depo., p. 41:14–16]; [Doc. 78 at p. 59]. Hence, Blash contends that he should have received the benefit of his own independent investigation in order to

clear the accusations made against him. [Doc. 78 at p. 59]. No, these two situations are completely different.

Lewis I instructs that Blash and his comparators "need *not* be 'similar in all but the protected ways.'" 918 F.3d at 1227 (emphasis in original) (citation omitted). Therefore, Blash "needn't prove" that he and his comparators "are identical save for their race[,]" "[n]or is it necessary" for him to prove that he and his comparators had "precisely the same title." *Id.* Instead, the relevant inquiry, based on "substantive likeness," is whether Defendant Cape subjected Blash and his comparators to different employment policies. *Id.* at 1227–28 (citing *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999);

> Ordinarily, a plaintiff's proffered comparators:
>
> - will have engaged in the same basic conduct (or misconduct);
> - will have been subject to the same employment policy, guideline, or rule;
> - will have been under the jurisdiction of the same supervisor; and,
> - will share that plaintiff's employment or disciplinary history.

*Lewis I*, 918 F.3d at 1227–28. Certainly, these points are not intended to be an exhaustive list to determine comparator-based similarity. Instead, they are merely examples to guide a district court's analysis under the new standard governing these types of cases. In short, the "all material respects" standard turns a comparator analysis "not on formal labels, but rather on substantive likeness." *Id.* at 1228. To better explain this new standard, the Eleventh Circuit of Appeals, using the Supreme Court's phrasing, stressed

that a plaintiff and his comparators "must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv.*, 575 U.S. 206, 231 (2015)).

While Blash and his comparators are admittedly similar in some respects, there is, nonetheless, a substantial difference when it comes to their misconduct. Blash's conduct of allegedly compromising a USPS investigation can be reasonably distinguished from Deputies White and Peavy's alleged assault of an African-American male during his arrest. Such a clear difference pulls Blash's comparators from underneath a "sufficiently similar" label. This is enough to end the inquiry, because "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct . . . ." *Lewis I*, 918 F.3d at 1228. "Treating *different* cases differently is not discriminatory, let alone intentionally so." *Id.* at 1222–23 (emphasis in original) (citation omitted). If Blash is arguing that because his alleged misconduct and the alleged misconduct of his comparators were both criminal in their nature, he, like the plaintiff in *Lewis*, "glosses over critical differences" and paints with too broad a brush. *Id.* at 1230. Clearly these two incidents—both perpetuating allegations of misconduct by sheriff's deputies—can

be reasonably distinguished. *Id.* at 1228. Blash's alleged violation of his oath of office[10] versus Deputies White and Peavy's alleged assault on an African-American arrestee is "simply too dissimilar to permit a valid inference that invidious discrimination is afoot." *Id.* at 1229; [Doc. 11-1 at p. 3]; [Doc. 36].

Moreover, when it comes to whether Blash and his comparators are subject to the same employment policy, guideline, or rule, the "likely" answer is yes. Notwithstanding the fact that there is no policy that *required* Defendant Cape to give all deputies accused of *any* criminal misconduct an investigation by the GBI, Blash also failed to submit any policies or guidelines to permit the Court to make any comparison between Blash and Deputies White and Peavy. Although Blash filed what appears to be various page excerpts from Pulaski County's Personnel Policies and Procedures enacted by the "Pulaski County Commission," he offers nothing in the record to indicate that Defendant Cape was bound by them or that Deputies White and Peavy's employment was conditioned upon these same policies as well. *Compare* [Doc. 70-6] *with* [Doc. 70-7]. Of course, Blash isn't arguing that Defendant Cape failed to abide by the Pulaski County policies that Blash signed prior to his employment in 2010. [Doc. 70-6 at p. 4]; [Doc. 70-2 at ¶ 1]. In fact, the record shows that all parties involved adhered to the

---

[10] The Court previously took judicial notice of the fact that a Pulaski County Grand Jury returned a two-count Indictment [Doc. 11-1] against Blash as a result of his supposed interference with the USPS investigation—Violation of Oath by Public Officer and Obstruction of an Officer. [Doc. 11-1 at pp. 1, 3]; [Doc. 36].

"Grievance Policy" section in light of Blash's appeal of his termination to Pulaski County's Sole Commissioner, M.A. Butch Hall.  [Doc. 70-7 at pp. 2–3].

However, one provision in Pulaski County's Personnel Policies and Procedures states, "Other personnel information may be available for official purposes at the discretion of the governing authority." [Doc. 70-7 at p. 3]. Thus, the question becomes: did Defendant Cape, as the "governing authority" for the Sheriff's Office, have any "other personnel information?" We don't know. Unquestionably, Blash states in his declaration that Defendant Brannen was his direct supervisor and that Defendant Brannen, "[a]s a matter of policy and procedure in the Pulaski County Sheriff Office" would make a recommendation for discharge. [Doc. 70-15, Blash Dec., ¶ 10]. Yet, any concrete existence of this supposed policy and procedure is wholly absent from the record, and *now* is the time to present it to the Court for consideration. Moreover, if, as Blash claimed in his deposition, that a GBI investigation is "[n]ormal protocol," this "protocol" and "other personnel information" is likewise uncorroborated and unknown to the Court.[11] [Doc. 78, Blash Depo., 41:22—42:2].

---

[11] Blash's own declarant, Anthony Taylor, who also used to work for the Pulaski County Sheriff's Office, stated that he "observed that there were no policies regarding what were considered job infractions." [Doc. 70-18, Taylor Dec., ¶ 16]. Yet, as already mentioned, Blash apparently signed a Certificate of Receipt of Company Policy for Pulaski County. [Doc. 70-6 at p. 4]. Now, whether these were the policies that governed Blash's employment, he doesn't tell us. By what Blash provides, Pulaski County's entire "policy" consists of four pages and begins with a numerical list (starting at Number 21) of what appears to be infractions. [Doc. 70-7 at pp. 2–5]. Did former Deputy Anthony Taylor not receive this list within his policies? Did he even sign a Certificate of Receipt of Company Policy for Pulaski County, like Blash? Again, we don't know.

The polices Blash placed into the record have nothing to do with Defendant Cape's alleged requirement to invoke a GBI investigation for every single allegation of criminal misconduct possibly committed by his deputies—if such a requirement even exists. To the extent Blash is asking the Court to rewrite what could be a non-existent policy, mandating GBI (or other third-party) investigations any time a sheriff's deputy's employment may be in legal jeopardy due to a potential criminal infraction, such a request contravenes the spirit of this circuit's "material respects" standard. *Lewis*, 918 F.3d at 1228.

This standard, when met, allows inferences of unlawful discrimination to surface and leaves employers with the "necessary breathing space to make appropriate business judgments." *Id.* We must remember that "[s]heriffs alone hire and fire their deputies[,]" which is precisely what happened in this case. *Manders*, 338 F.3d at 1311 (citing O.C.G.A. § 15-16-23). Defendant Cape, irrespective of whether it was an informed one, appears to have made the decision to terminate Blash for a nondiscriminatory, fireable offense. Regardless, when an employer acts under the mistaken, but honest, impression "that [his] employee violated a work rule," he is not liable for discriminatory conduct. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). Thus, *even if* Blash could make a prima facie case,

---

Anthony Taylor also states in his declaration that "[w]henever a [s]heriff's [d]eputy had an alleged infraction [Defendant] Cape would call the GBI to investigate." [Doc. 70-18, Taylor Dec., ¶ 22]. Again, the Court must ask, perusing the record once more: Where is this policy?

Defendant Cape could meet his burden under *McDonnell Douglas* by "articulat[ing] a legitimate, nondiscriminatory reason for [his] actions." *Lewis I*, 918 F.3d at 1221.

But here's the snag. Blash contends that Defendants' legitimate nondiscriminatory reason is "bogus," because "the investigation had already concluded" and because "[i]t was common place for officers to tell civilians [to] stay away from individuals who are thought to be potential criminals."[12] [Doc. 58 at ¶¶ 23–

---

[12] When questioned about this "common practice," Defendant Brannen responded, "I don't understand the question." [Doc. 72-1, Brannen Depo., p. 27:4–7]. Rather than rephrase his question in hopes to extract some answer, Blash completely abandoned this question and proceeded to ask about the "sting operation involving . . . Renee Howard." [*Id.* at 27:8–10]. However, Blash, in his declaration, states that it was, in fact, "common practice for police officers" to caution civilians "with whom they were familiar," using "words to the effect that 'you should stay away' or 'be careful.'" [Doc. 70-15, Blash Dec., ¶ 6]. Moreover, the allegation that this conduct is common practice in the Pulaski County Sheriff's Office is further corroborated by the Declaration of Eddie Nieves [Doc. 73-1]. Based on the Court's consideration of Eddie Nieves's Declaration, Blash's Motion to Accept [Doc. 73] is **GRANTED**. In his declaration, Eddie Nieves states that he is "not aware of any police officer or [s]heriff's [d]eputy being disciplined or terminated for this conduct that law enforcement officers routinely do." [Doc. 73-1, Nieves Dec., ¶ 21]. Since Blash's declaration and Eddie Nieves' declaration are both admissible forms of evidence under Federal Rule of Civil Procedure 56(c), and because there is no evidence to the contrary, it must be accepted that Blash's warning to Scott Orta to stay away from Renee Howard was common practice among "police officers and *[s]heriff's [d]eputies* . . . at the highest level." [*Id.* (emphasis added)].

However, the existence of this common practice is of no consequence. There is absolutely no *evidence* in the record that Defendant Cape was aware of any prior instances or even tolerated this allegedly common practice. Although Blash claims (in his Amended Complaint) that "[t]he common practice of officers telling civilians that they should stay away from potential criminals was well known by . . . [Defendant] Cape," pleadings are not evidence. [Doc. 58 at ¶ 25]. Therefore, the contents of Blash's Amended Complaint cannot be relied upon to establish fact. *Am. Safety Indem. Co. v. T.H. Taylor, Inc.*, 513 F. App'x 807, 815 (11th Cir. 2013) ("Such statements by counsel in pleadings are not evidence."); *Dowell v. Prime Healthcare Corp.*, No. CIV. A. 00–D–686–E, 2001 WL 611198, at *5 (M.D. Ala. May 4, 2001).

25]. Briefly mentioned above, "the [Pulaski County] Sheriff's Office assigned [Jay Williams]," who was at the time, a deputy sheriff,[13] "to work with the Oconee Drug Task Force" to assist the USPS with its criminal investigation. [Doc. 64-3, Williams Aff., ¶¶ 3–4]. Following a pre-operation[14] briefing in "late November 2014," USPS Agent Jarrett Arrington contacted then-Deputy Williams to express his concerns that the investigation may have been compromised, because its "existence had been leaked to Scott Orta." [*Id.* at ¶¶ 5, 10]. After confirming (via interview with Scott Orta) that Blash was the individual who spoke to Scott Orta, then-Deputy Williams "briefed" his supervisor, Major Jason Freemont, and informed him that "Blash had compromised the postal investigation." [*Id.* at ¶¶ 15–20]. Following that briefing, Defendant Brannen admits that he and Major Freemont had "a conversation;" however, it was Major

---

Irrespective of whether this common practice exists, there's a big difference between telling someone to stay away from another person in a general sense—i.e. "[H]ey man[,] you need to watch what you're doing," "[Y]ou should stay away," or "[B]e careful"—versus telling someone to stay away from a specific target of an investigation. [Doc. 70-16, McGriff Dec., ¶ 21]; [Doc. 70-15, Blash Dec, ¶ 6]. Blash's general statement that he says ". . . stay away" to people "with whom [he is] familiar" could mean anything. It could mean something as generic as "stay away" from gangs because they're bad. This oversimplified testimony seems to be another instance of Blash painting in generalities when the canvas demands much greater detail. *See Lewis I*, 918 F.3d at 1229–30.

[13] Jay Williams is now employed as a Narcotics Investigator with the Wilcox County Sheriff's Office. [Doc. 64-3, Williams Aff., ¶ 2].

[14] Jay Williams' statements with regard to a "pre-operation briefing" seems to indicate that the investigation was still ongoing, and not, as Blash's suggests, "over." [Doc. 64-3, Williams Aff., ¶ 5]; [Doc. 70-15, Blash Dec., ¶ 7]. The parties have not once been able to present a clear timeline of what actually transpired in the days leading up to Blash's termination, and the Court will not belabor over "what-ifs" or "what could have beens" in order to streamline a logical sequence of events. No one seems to be able to present a true, comprehensive, representative timeline of events for this case; thankfully, however, one is not needed to decide this case. All that is needed to proof of race motivated Defendant Cape's decision to terminate Blash.

Freemont who subsequently briefed Defendant Cape, not Defendant Brannen.[15] [Doc. 72-1, Brannen Depo., pp. 28:25—31:1]; [Doc. 64-4 at pp. 3–4]. Based on this information, Defendant Cape met with Blash, Major Freemont, and Defendant Brannen, and during this meeting, Defendant Cape told Blash he "was going to be terminated." [Doc. 72-1, Brannen Depo., p. 31:14–15]. Now, as stated earlier, whether this was an informed decision or even the correct one, the bottom line is that any employment action rested with Defendant Cape. *See Damon*, 196 F.3d at 1363 n.3 (citation omitted) ("An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long *as its action is not for a discriminatory reason*.'"). While no one can testify as to Defendant Cape's thoughts, there is nothing in the record showing that race was a motiving factor behind his decision to terminate Blash.

Purely for the sake of being thorough, Blash and his comparators are conceivably similarly-situated under the remaining, but non-exhaustive points. For instance, Blash, White, and Peavy—as deputies—were all under the same supervisor, Defendant Cape. Further, because the Court must draw all justifiable inferences in Blash's favor, the record tells us that Deputy White and Blash could probably be deemed "similarly situated" even when it comes to employment and disciplinary history, because they both received an "increase in pay" in "recognition of [six] months [of] service."

---

[15] Defendant Cape never discussed his decision to fire Blash with Defendant Brannen. [Doc. 72-1, Brannen Depo., 28:21–24].

*Anderson*, 477 U.S. at 255; [Doc. 70-8 at p. 3]. However, that is all we know. The record includes only one favorable employee assessment for Blash, but there is no employee assessment for Deputy White to allow further comparison. [Doc. 70-8 at p. 2]. What's more, there is absolutely nothing in the record (pay-raise related or otherwise) pertaining to Deputy Peavy's employment or disciplinary history. Whether Deputies White and Peavy are similarly situated to Blash because of their employment and disciplinary history or because they are under the same supervisor is of no consequence—the assault allegations made against Deputies White and Peavy are alone enough to extract them from the comparator label using *Lewis I*'s "all material respects" standard.

As discussed above—because they engaged in substantially different misconduct—the Court finds that Deputies White and Peavy are not similar to Blash "in all material respects," and thus are not valid comparators for the purposes of Blash's prima facie case under *McDonnell Douglas*'s burden-shifting framework. However, Blash's inability to produce a comparator does not necessarily doom his case. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

ii.     The Convincing Mosaic Theory

The Court's determination that Blash failed to establish a prima facie case under *McDonnell Douglas*, because Deputies White and Peavy were not similarly situated in all

material respects, does not absolutely foreclose his race-discrimination claims. The Eleventh Circuit Court of Appeals is clear that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lewis II*, 934 F.3d at 1185 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). Earlier, the Court briefly mentioned another way through which a plaintiff may overcome a defendant's motion for summary judgment in a Title VII case—presenting a mosaic of circumstantial evidence that raises a genuine issue of material fact. *See* Section (III)(B)(3)(i).

Even without similarly-situated comparators, a "plaintiff will always survive summary judgment if he . . . presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent . . . that would allow a jury to infer intentional discrimination." *Lewis II*, 934 F.3d at 1185 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A plaintiff may show a convincing mosaic through evidence demonstrating, among other things, (1) suspicious timing and ambiguous statements as well as "other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly-situated employees, and (3) that the employer's justification is pretextual. *Lewis II*, 934 F.3d at 1185 (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)). "The evidence presented under the 'convincing mosaic' *must be sufficient enough* 'to overcome the lack of

comparator evidence.'" *Woodward v. Jim Hudson Luxury Cars, Inc.*, No. CV 118-032, 2019 WL 4793058, at *8 (S.D. Ga. September 30, 2019) (emphasis added) (quoting *Williams v. Cleaver-Brooks, Inc.*, No. 7:11-CV-144 (HL), 2012 WL 6151141, at *8 (M.D. Ga. Dec. 11, 2012)).

First, to support his position, Blash lists two other deputies—Jay Williams and Jay Wood—in addition to the previously-proffered comparators, Deputies White and Peavy. As for Jay Wood, he was "[a]ccused of using hostile and abusive language[,]" an infraction Blash has never been accused of committing. [Doc. 78, Blash Depo., p. 40:3–10]. Thus, Deputy Jay Wood's actions provide no assistance to Blash's case or to the Court's analysis. Deputy Jay Williams,[16] on the other hand, "drove his patrol car out of the county," to Perry, Georgia, sometime in 2013. [Doc. 78, Blash Depo., pp. 39:15—40:2]; [Doc. 72-1, Brannen Depo., p. 37:19–22]. Although Deputy Jay Williams' infraction was ostensibly "against the rules," Defendant Cape only issued a "verbal reprimand." [Doc. 72-1, Brannen Depo., pp. 37:9—38:3]. Blash, incidentally, also used a patrol car "while not on police business." [*Id.* at 38:4–7]. However, rather than verbally reprimand Blash, Defendant Cape suspended him for two days and prohibited him from driving his patrol car home for a six-month period. [*Id.* at 38:8–12].

---

[16] This is presumably the same Jay Williams mentioned above, employed by the Pulaski County Sheriff's Office as a deputy from July 12, 2010, until July 13, 2015. [Doc. 64-3, Williams Aff., ¶ 3].

Deputy Jay Williams's incident occurred in 2013, Blash's—we, of course, aren't told. Looking at this scenario on its most basic level: two deputies, one black and one white, used their patrol cars for an unapproved purpose and received different punishments. However, this instance was not what caused Blash to file his EEOC Charge of Discrimination, and there is no evidence that it somehow motivated Defendant Cape's decision to terminate him in 2014. Taking these facts to be true, as little as we have, the record does not definitively show whether Deputy Jay Williams had been employed longer than Blash or whether they shared common employment or disciplinary histories. Looking at the record, a conclusion that Blash and Deputy Jay Williams were similarly situated is simply too speculative. Even assuming without deciding, however, that Blash and Deputy Jay Williams were similarly situated— lending to the notion that Defendant Cape afforded "better treatment" to the white deputy—this single, solitary instance is far from demonstrating the "systematically better treatment" that is needed to lead to an inference of discrimination needed to present a convincing mosaic theory. *Lewis II*, 934 F.3d at 1185.

Hoping to add another tile to his mosaic of race discrimination, Blash obtained the Declaration of Anthony Taylor (introduced above), a former deputy in the Pulaski County Sheriff's Office who, like Blash, is African American. [Doc. 70-18, Taylor Dec., ¶¶ 4, 8]. According to Deputy Taylor, he experienced differential treatment based on his race when Defendant Cape refused to let him drive his patrol car to his home,

"ostensibly because of the distance" but allowed a white deputy, "who lived at least as far or further than [Deputy Taylor]" to drive his patrol car home. [*Id.* at ¶¶ 13–14]. It was not until the white deputy was permitted to drive his patrol car home that Deputy Taylor was also allowed to do so. [*Id.* at ¶ 15].

This scenario, however, can be quickly dismissed as evidentiary support for the convincing mosaic theory. Blash offers no evidence regarding whether Defendant Cape's actions towards Deputy Taylor occurred in relation to Blash's termination. *See Woodward*, 2019 WL 4793058, at *8 n.5 (citing *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1242 (11th Cir. 2016)) (considering temporal proximity of other events allegedly linked to the adverse employment action at issue). Looking at the contents of the Declaration of Anthony Taylor, we see that Deputy Taylor worked in the Pulaski County Sheriff's Office "from 2010 to 2016," and that "more than a year after [he] had been working as a . . . [d]eputy," Defendant Cape permitted a newly-hired white deputy to drive his patrol car home. [Doc. 70-18, Taylor Dec., ¶¶ 8, 14]. As for exactly when this occurred in relation to Blash's adverse employment action in 2014, the record is silent. As his declaration is written, Deputy Taylor's scenario could have occurred anytime between 2011 and 2016. Overly-broad timing issues aside, there is, most importantly, no evidence that this scenario is somehow linked to any alleged discriminatory intent from Defendant Cape when it comes to Blash's termination.

Without more, the Court is not willing to say that this event presents sufficient evidence to overcome Blash's lack of a comparator. *Woodward*, 2019 WL 4793058, at *8, *supra*.

In keeping with the ever-important balance between employee protection and an employer's rational business judgments, the Court is not in the position to adjudge whether employment decisions are prudent or fair and to act as some sort of super personnel department. *Lewis I*, 918 F.3d at 1224–25; *Morgan v. Birmingham Bd. of Educ.*, No. 2:17-cv-02031-ACA, 2019 WL 4805786, at *6 (N.D. Ala. Oct. 1, 2019); *see also* [Doc. 74 at pp. 5–6 (citing *Flowers v. Troup Cty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015))]. Instead, the Court's "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Morgan*, 2019 WL 4805786, at *6 (quoting *Damon*, 196 F.3d at 1361). Blash has not shown this; therefore, his attempt to create a convincing mosaic of race discrimination also fails.

    4. Defendants' Argument That Defendant Cape Is Entitled
      to Qualified Immunity as to Blash's Section 1983 Claim

Time and time again, Blash tells the Court that Defendant Brannen "at all relevant times . . . harbored racial *animus*," used pejorative terms when referring to African Americans, and was even suspended for four days for hostile behavior towards a former deputy who was African American. [Doc. 70-2 at ¶¶ 14–15]; [Doc. 70-15, Blash Dec., ¶ 8 ("Anthony Taylor was a [d]eputy in the Pulaski County Sheriff's Office. He is African American.")]. However, what Defendant Brannen did or how he acted does not matter, nor will it ever (for purposes of this lawsuit). Thus, in light of the Court's

discussion and ruling on Blash's Motion for Reconsideration [Doc. 76], any further attempt to resurrect a cat's paw theory via numerous declarations by those familiar with Defendant Brannen is unavailing. *See* [Doc. 100]. All that matters is Defendant Cape's reason for terminating Blash.

Through this lens, a mixed-motive theory of race discrimination must also fail. This theory requires a plaintiff to show that (1) the defendant took an adverse employment action against him and that (2) a protected characteristic was a motivating factor for the defendant's adverse employment action. *Quigg*, 814 F.3d at 1232–33. Based purely on the evidence presented to the Court, there is nothing to say exactly what was the motivating factor. Defendants even argue that "the relevant inquiry is whether [Defendant] Cape had a good faith belief that [Blash] interfered with a pending [USPS] investigation and whether that belief motivated the termination." [Doc. 74 at p. 6 (citing *EEOC v. Total Sys. Servs. Inc.*, 221 F.3d 1171, 1176–77 (11th Cir. 1991))]. However, based on the above discussion, Blash has not shown that his race was a motivating factor behind his termination, and that is the ultimate question. It is Defendant Cape's mind, and his mind alone, that matters in this case. As stated above, the obvious story is that Defendant Cape terminated Blash because Blash interfered with the USPS's investigation. Whether this was an informed decision or even the correct course of action is not for the Court to consider. *See* Section (III)(B)(3)(i), *supra*; *Morgan*, 2019 WL 4805786, at *6. If Defendant Cape believed that Blash committed a fireable offense and

fired Blash, the Court cannot second guess that decision absent any proof of racially discriminatory intent. Blash, however, believes that his case survives summary judgment solely because "[he] disputes the existence of a lawful motive." [Doc. 70 at p. 24].

Essentially, Blash argues something that "might have" occurred as "fact." In his Response brief to Defendants' summary judgment motion, Blash states, "The fact that [Defendants] might have used [Blash's] warning to Orta to manufacture a trumped-up reason to fire him . . . does not . . . permit [Defendant Cape] to establish the *undisputed* existence of lawful motive for [Blash's termination]." [*Id.* at p. 25]. What Blash must prove, is that Defendant Cape was aware that Major Freemont conveyed false information to him regarding the USPS investigation interference, and that he, in spite of that knowledge, terminated Blash because of his race. This simply cannot be shown by this case's record. We do not know, nor will we ever know, Defendant Cape's state of mind, because no one ever took his deposition or received an affidavit or declaration from him. There is no evidence that Defendant Cape did not honestly believe—rightly or wrongly—that what he was told regarding the alleged compromise of the USPS investigation actually occurred. *See Damon*, 196 F.3d at 1363 n.3, *supra*. Without this evidence, it is impossible for Blash to show whether Defendant Cape's decision to terminate him was motivated by discriminatory animus.

Accordingly, Defendant Cape is entitled to qualified immunity with respect to Blash's race-discrimination claim under 42 U.S.C. § 1983. To establish the defense of qualified immunity, a defendant must first show that he acted within the scope of his discretionary authority in performing the challenged conduct, and if so, the plaintiff has the burden to demonstrate that: (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation. *Morris v. Town of Lexington*, 748 F.3d 1316, 1322 (11th Cir. 2014). "The contour of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This "clearly established" prong demands consideration of the law "in light of the specific context of the case, not as a broad general proposition." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1282 (11th Cir. 2008) (quoting *Williams Consolidated City of Jacksonville*, 341 F.3d 1261, 1269 (11th Cir. 2003)). Generally, a supervisor sued in his individual capacity is entitled to qualified immunity unless he personally engaged in conduct constituting a constitutional violation or, based on information known to him, a reasonable supervisor would have known that his actions were unlawful in light of clearly-established law; in other words, supervisor liability must be based on something more than the theory of *respondeat superior*. *See Crawford v. Carroll*, 529 F.3d 961, 978–79 (11th Cir. 2008); *Greason v. Kemp*, 891 F.2d 829, 836–37 (11th Cir. 1990).

It is clearly established that the Equal Protection Clause protects against intentional discrimination in employment on the basis of race. *See generally Lewis I*, 918 F.3d 1213 (11th Cir. 2019). When a mixed motive theory of discrimination is advanced, qualified immunity can still apply because it is clearly established that "state officials 'can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully.'" *Rioux*, 520 F.3d at 1283 (discussing qualified immunity in the mixed motive context). This applies where the record shows state officials would have acted the same, "even if they had lacked discriminatory intent." *Id.*

In this case, there can be no reasonable dispute that Defendant Cape acted within his discretionary authority when he fired Blash. Moreover, the record shows that his decision was not motivated by any personal bias or racial *animus*, but rather on his impression of the events surrounding the USPS investigation, thus there is evidence that Defendant Cape acted at least—in part—by a lawful motive. *See Rioux*, 520 F.3d at 1284–85 (stating a defendant is entitled to qualified immunity if the undisputed record shows "that the defendant in fact was motivated, at least in part, by lawful considerations"). Thus, because Defendant Cape terminated Blash for allegedly interfering with an investigation, his reasons were lawful and he is entitled to qualified immunity.

# V.    CONCLUSION

Based on all of the foregoing, the Court **GRANTS** Defendants' Motion for

Summary Judgment [Doc. 64][17] and **DIRECTS** the Clerk of Court of **CLOSE** this case.

    **SO ORDERED**, this 30th day of December, 2019.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[17] The Court previously mentioned its "grave concerns" regarding the Eleventh Amendment with respect to Blash's Section 1983 claim asserted against Defendant Brannen in his official capacity. [Doc. 37 at p. 22]. Despite the Court's clear notice of its intent to address those concerns, neither party addressed the issue. [*Id.* at pp. 22–23]. However, as discussed in that Order, the sheriff is an elected, constitutional officer, subject to the charge of the General Assembly and is not an employee of the county commission. *Manders*, 338 F.3d at 1347 (holding that in the context of establishing use-of-force policy and training and disciplining deputies, a sheriff is an "arm of the state"). Consistent with previous rulings from this district, "[t]he Court is not holding that [s]heriffs and their employees *always* act as arms of the state; however, it is clear that in the context of employment decisions [s]heriffs and their employees are state officers." *Halliburton v. Peach Cnty. Sheriff's Dept.*, No. 5:11-CV-109(MTT), 2012 WL 4468764, at *5 (M.D. Ga. Sept. 26, 2012) (citing O.C.G.A. § 15-16-23) (Sheriff's offices are independent of the county in which they are located with respect to employment decisions and actions). Therefore, because the Eleventh Amendment prohibits damages suits against state officials acting in their official capacities, the Court also **GRANTS** summary judgment to Defendant Brannen on Blash's Section 1983 claim asserted against him in his official capacity.